UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONTE LEONARD,

          Petitioner,                         Case Number: 13-CV-13505

v.                                        Honorable Patrick J. Duggan

CARMEN D. PALMER,

          Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

### I.  INTRODUCTION

Petitioner Donte Leonard, a Michigan Department of Corrections prisoner confined at the Chippewa Correctional Facility in Kincheloe, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 2007, he was found guilty by a jury in Oakland County Circuit Court of assault with intent to rob while armed, Mich. Comp. Laws § 750.89, conspiracy to commit armed robbery, Mich. Comp. Laws §§ 750.157a & 750.529, first-degree home invasion, Mich. Comp. Laws § 750.110a(2), and conspiracy to commit first-degree home invasion, Mich. Comp. Laws §§ 750.157a & 750.110a(2).  He challenges his convictions on the grounds that the prosecutor presented insufficient evidence to sustain the convictions,

the trial court erred in refusing to charge the jury on accessory after the fact, the trial court erred in denying Petitioner's motion to quash, offense variables 1, 2, 10, and 13 were incorrectly scored, and the trial court improperly admitted the audiotape of a 911 call. The Court concludes that Petitioner is not entitled to the issuance of the writ of habeas corpus. Accordingly, the Court will deny the petition and will decline to issue a certificate of appealability.

## II. BACKGROUND

Petitioner's convictions arise from a home invasion and armed robbery occurring at the home of Jennifer Locke during the early morning hours of January 25, 2010. Petitioner was tried in Oakland County Circuit Court with co-defendants Kyle Lester and Justin Sanford. The trial court ordered two separate juries, one for Lester, and one for Sanford and Leonard. The Michigan Court of Appeals provided a lengthy summary of the facts adduced at trial leading to Petitioner's convictions:

> According to the testimony of Darius Lewis, on January 25, 2010, he was at a friend's house playing cards when he received a telephone call from defendant Donte Leonard. Leonard asked Lewis to come to a strip club called "Cheetah's" and get him so that they could "hit this lick," which Lewis understood to mean rob someone.
>
> Lewis, who was wearing a red sweater, a red hat, and black pants, drove his red Grand Prix to Cheetah's. Leonard was waiting outside in the parking lot. Leonard got into the car and said that they were "about [to] hit a lick on a stripper." Lewis also saw defendants Kyle Lester and Justin Sanford. Lewis testified that another individual, Jayson Holt, also came out of the strip club.

2

Lewis testified that he and Leonard were in the red Grand Prix and the others (Sanford, Lester, and Holt) were in a green Impala.... Lewis testified that they then waited for a woman to come out of the club. Apparently, the woman got into what Lewis described as a beige Tahoe. Lewis did not actually see the Tahoe or the Impala leave, but he believed that the Impala followed the Tahoe because Holt then called Leonard, who directed Lewis to catch up with the other vehicle. Once Lewis caught up on Dorchester Street, he pulled up in front of a house behind the green Impala. Lewis saw the beige-colored Tahoe and saw a woman "closing the door." []

Leonard got out of Lewis's car and got into the Impala. The Impala then turned around and parked on the corner. Lewis followed suit, and turned around too. Lester, Holt, Sanford, and Leonard got out of the Impala, and Lewis got out of his car. Lewis testified that "they was ready to go." Leonard had a gray gun, and Holt had a black gun. Lewis did not see Sanford or Lester with guns. Lewis testified, "We wasn't going to go in, then [Holt] said, 'Come on. We're going in ...' I'm, like, 'I ain't going.'" Lewis did not know if anyone else said "no," but he was the only one who turned around. Lewis testified that after he turned around, he went back to his car.

Lewis testified that the other four men, who all had masks on, then started to walk toward the house. Leonard and Holt went toward the back of the house, and Lester and Sanford walked toward the front of the house. Lewis got into his car, and as he was passing the house, he saw the police coming toward him. Lewis also heard the door to the house (608 Dorchester) being kicked in and heard, "Get down." ... Lewis never saw anyone actually enter the house or leave the house. The police then stopped and arrested Lewis.

***

Jennifer Locke testified that on the evening of January 24, 2010, and going into January 25, 2010, she was working her shift as a hostess at Cheetah's. Sanford, who had been at the club a couple times before that night, was there. According to Locke, Sanford repeatedly asked her where she lived and asked for her phone number, but Locke did not give

him either....

Locke left work at approximately 2:30 a.m. and proceeded to drive home. She was driving a tan 2001 Suburban. Before exiting I-75 onto Eleven Mile Road, Locke noticed a dark car next to her, but she was not concerned about it. But Locke noticed that as she turned down a street, the dark car turned on the next street. Then, when Locke was getting ready to turn onto her block, she saw the car again with its headlights off. As Locke pulled into her driveway, she saw the dark car drive past her house, still with its headlights off. As she got out of her car and headed to the front door of her house, she then saw a red car pull up in front of her house. The dark car had parked two houses down the street. At that point, Locke hurried to get into her house....

Inside the house were Locke's two youngest children, who were five and six years old, and the babysitter, Tonya Brown. Locke woke up Brown and told her that she thought someone had followed her home. Locke and Brown then looked out the window to "see if they'll [the men] go away." Locke saw the passenger from the red car talking to whoever was in the other dark car. The talk lasted for a minute and a half or two minutes. Locke then saw two men start to walk up to her house. One of the men was the man who had gotten out of the red car. Then, according to Locke, they turned around. They got back in the dark car, and the dark car turned around and parked on the corner. Locke believed that the red car moved as well, but was not certain. Locke thought they had left, so she opened her front door, but she then heard two doors, presumably car doors, slam. At that point, Locke saw two black men approaching her house, so she grabbed her children, hid in a closet, and called 911. Locke could not tell if these two men were the same ones she had seen before. At the same time, Brown ran into the bathroom and shut the door.

Locke heard a door break in and heard someone yell, "ATF. Get the [F* * *] down." Brown similarly testified that she heard two voices yelling, "ATF. Police. Get down." Locke heard more than one person, but she did not know if more than one person yelled. Locke heard someone upstairs. Brown heard someone downstairs and heard someone go upstairs. Locke, who was terrified, remained on the phone with 911.

4

According to Locke, the people were in the house for no longer than two minutes. Not long after hearing the people in the house, Brown saw police lights outside the bathroom window and saw an officer standing there, so she came out of the bathroom. Locke came out of the closet when she heard a police officer in her house. Locke heard the officers less than one minute after the men left.

Locke's purse and Brown's purse were missing, and Locke's laptop, which had been upstairs, was found downstairs on the kitchen floor. Both women's purses were returned, and nothing was missing from either purse.

At some point, Locke went with an officer to a police car that was parked in front of her house. Locke recognized the person seated in the back of the police car as Sanford because he had been in the club that night. Locke was unable to identify a person seated in another police car. Locke was unable to say whether she saw Leonard or Lester that night. Locke testified that she saw a person wearing a red sweatshirt or sweater, but it was unclear from her testimony which person she was referring to, and she never identified that individual at the scene. Locke never saw a gun that evening. Locke was unable to say for certain how many people were in the cars or were involved. Locke testified that there were more than two people in front of her house. On redirect examination, Locke testified that two doors had been broken in or forced open at the same time.

At approximately 3:00 a.m. on January 25, 2010, Officer Patrick Schneider received information via dispatch regarding suspicious circumstances at 608 Dorchester. As he was driving toward the location, he received information that there were four black males kicking in the front door at that address. As he turned onto Dorchester, he saw a vehicle coming toward him. Officer Schneider used his spotlight to illuminate the driver and saw one black male with no passengers. Officer Schneider then used his overhead lights to stop the vehicle. The car was a red 1997 Pontiac Grand Prix driven by Lewis....

Officer Lindsay Bowen also received a dispatch about a 911 call from 608 Dorchester on January 25, 2010. Someone had followed the caller

home and was kicking in the door. The suspect vehicles were believed to be a red sedan and a black Monte Carlo.  Officer Bowen saw a dark-colored Chevy Impala parked on Farnum, east of North Dorchester. She pulled up behind the vehicle, put the spotlight on the vehicle, and walked up to the driver's side. No one was inside the vehicle. As she was looking in the driver's side, a black male, whom she identified as Sanford, was walking toward her. Officer Bowen ordered him to come to the car and put his hands on the hood. Sanford said that it was his vehicle. She detained him and placed him in the back of her patrol car. She then turned him over to Officer Kenneth Spencer.  She believed that Sanford was wearing a dark-colored hoodie, but was not certain.

Officer Spencer also received a dispatch regarding 608 North Dorchester on January 25, 2010.  He parked a few houses down, walked toward the address, and heard a female voice screaming from inside the house.  He began running toward the house, and two other officers began entering the house.  Officer Spencer learned that four males had fled the house out the side door, so he went to the side door.  The door was open, and there were muddy boot prints or scuff marks on the door.... He saw one clear wet boot print going into the house on the concrete threshold.... Officer Spencer heard a neighbor yell that he had heard the noise and saw someone jump the fence into his yard and travel east.  Officer Spencer went to the front of the house and met Officer Bowen, who indicated that she had stopped a black male.  Officer Spencer looked inside the dark green Chevy Impala and saw a fresh, muddy boot print on the passenger floorboard that "matched exactly" the print he had seen on the threshold.  Officer Spencer testified that the person he took from Officer Bowen's car was Sanford. Officer Spencer patted down Sanford and felt a soft object in his front pocket; Sanford said the object was his hat. However, during booking, Officer Spencer discovered that it was a cold-weather mask.

***

When Officer David Koehler, a Madison Heights police officer with the K9 unit, arrived at the residence on 608 Dorchester, he was told that the suspects fled out the side door and through the backyard. Officer Koehler's dog picked up a track and ... eventually led the officer to the

front of the houses on Symes Avenue and alerted on something underneath some bushes in front of a house.  The police found hand guns covered up lightly with leaves underneath the bush in the front yard of 607 Symes.

Officer Lawrence Fajardo took the guns that were recovered into evidence.   One of the guns was a black "Glock, model 19, nine-millimeter handgun." Another was a silver "Ruger forty-caliber semi-automatic hand gun."  Officer Fajardo also recovered two purses from behind the local baseball field.

Because two African American male suspects from the incident were still outstanding, Officer Andrew Izydorek and Officer Crane set up surveillance outside 607 Symes in order to locate the suspects if they returned for the guns.  The officers were in unmarked vehicles for several hours.  At approximately 12:00 p.m., a vehicle turned onto Symes and was driving very slowly.  As the vehicle passed Officer Izydorek's vehicle, he could see that it was a green Pontiac with four African Americans inside.  The driver was an African American female. Officer Crane followed the Pontiac and told Officer Izydorek that the two backseat passengers had gotten out of the vehicle.  Officer Crane indicated that he was going to follow the two passengers who had exited.

The Pontiac drove by Officer Izydorek again, and there were only two people inside.  Officer Izydorek lost sight of the vehicle, but then saw it going west on Farnum, past Symes, and then lost sight of it again. At that time it was too far away for Officer Izydorek to see how many people were in the car. But approximately 30 seconds later, Officer Izydorek saw a young African American male walking east on Farnum and turn north on Symes.  As the man got near 607 Symes, he slowed his walk and stared intently at the house, but he continued to walk by the house. The man walked up to Officer Izydorek's vehicle and tried looking inside. Officer Izydorek was lying down in his vehicle. The man walked past the vehicle, looked like he was talking on his cell phone, turned around, and started walking south.   The man looked into Officer Izydorek's vehicle again as he passed. The man then started to walk up the driveway of 607 Symes.  Officer Izydorek then saw the man get on his hands and knees and started digging into the bush where the guns had

been located.  Officer Izydorek identified the man as Leonard.

After Leonard got back up, Officer Izydorek pulled up, turned his flashers on, and Leonard started running toward Farnum.  Officer Izydorek followed him in his vehicle, and ... was able to take him into custody.  The police also detained the driver of the Pontiac and the other two individuals who had gotten out of the vehicle.

*People v. Sanford*, Nos. 300852, 301192 & 301211, 2012 WL 975030, at *1-4 (Mich.

Ct. App. Mar. 22, 2012).

### III.  PROCEDURAL HISTORY

Following a jury trial in Oakland County Circuit Court, Petitioner was convicted of assault with intent to rob while armed, conspiracy to commit armed robbery, first-degree home invasion, and conspiracy to commit first-degree home invasion.  On September 27, 2010, he was sentenced to 15 to 30 years' imprisonment for each of the convictions.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising these claims: (i) insufficient evidence presented to sustain Petitioner's convictions; (ii) trial court erred in refusing to instruct the jury on accessory after the fact and/or aiding and abetting after the fact; (iii) trial court denied Petitioner's due process rights by denying motion to quash the information; (iv) offense variables 1, 2, 10, and 13 were incorrectly scored; and (v) audiotape of 911 call improperly admitted.  Petitioner filed a supplemental pro per brief claiming that the prosecutor's brief misstated the facts

adduced at trial. The Michigan Court of Appeals consolidated Petitioner's appeal with that of his co-defendants and affirmed Petitioner's conviction, but remanded for correction of the presentence investigation report. *Sanford*, 2012 WL 975030, at *1, 24.

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals, except for the claim raised in the pro per supplemental brief. The Michigan Supreme Court denied leave to appeal. *People v. Leonard*, 492 Mich. 868, 820 N.W.2d 164 (Mich. 2012).

Petitioner then filed the present habeas petition. He raises these claims:

I.      Michigan law and the Due Process Clauses of the Michigan and United States constitutions require sufficient evidence to convict a defendant of a criminal offense. There was insufficient evidence that Petitioner participated in an armed robbery, insufficient evidence that those that did participate were armed with any weapons, and insufficient evidence that Petitioner conspired with the participants in any way.

II.     The trial court reversibly erred in refusing to charge the jury a separate verdict on accessory after the fact and/or aiding and abetting after the fact and violated Petitioner's right to a fair trial and due process of law.

III.    The trial court erred and violated Petitioner's due process rights in denying Petitioner's motion to quash the information for the reasons that there was insufficient evidence adduced at the preliminary examination that an armed robbery was committed or that Petitioner participated, or conspired to participate, in that crime.

IV.     The trial court abused its discretion and violated Petitioner's due process of law in misscoring Petitioner's offense variables which affected Petitioner's sentence guidelines, to-wit: offense variables 1, 2, 10, and

13; and by including a prejudicial reference to a triple shooting at the complaining witness's workplace that Petitioner had nothing to do with.

V.      The trial court abused its discretion and deprived Petitioner of his rights to due process of law and a fair trial in admitting the audiotape of the 911 call to the police when any probative value was outweighed by its unfair prejudice.

## IV.  LEGAL STANDARD

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000).  An "unreasonable application" occurs when

"a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 408, 120 S. Ct. at 1521. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S. Ct. at 1522.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7, 117 S. Ct. 2059, 2066 n.7 (1997)); *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102, 131 S. Ct. at 786. Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments

11

or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.*

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 2796 n.5 (1979)) (Stevens, J., concurring)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S. Ct. at 786-87.

Additionally, a state court's factual determinations are entitled to a presumption of correctness on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner

may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## V. ANALYSIS

### A. Sufficiency of the Evidence

In his first habeas claim, Petitioner argues that insufficient evidence was presented to sustain his convictions. He argues that the prosecutor failed to prove, beyond a reasonable doubt, his identity as one of the perpetrators, any conspiracy, or that the perpetrators were armed.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789 (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown*

*v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006), (quoting *Jackson*, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (emphasis in original). Second, if the Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original).

### 1. Identity

First, Petitioner argues that the prosecutor failed to prove his identity as one of the perpetrators primarily because, he argues, Lewis's testimony was inherently incredible. The Michigan Court of Appeals rejected this claim. The state court first noted that in reviewing a sufficiency of the evidence claim, it was not to act as a "thirteenth juror." *Sanford*, 2012 WL 975030, at *7. The state court concluded that sufficient evidence was presented to establish Petitioner's identity, relying on the

14

following facts adduced at trial: Petitioner's statement to Lewis that he was going to "hit this lick"; when they were outside the victim's house, Petitioner was carrying a gun and wearing a mask; Lewis saw Petitioner approach the victim's house and heard a door being broken in; and the day after the break-in, police saw Petitioner digging under the bush where the guns were located.

"A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). According the state court's findings of fact a presumption of correctness, and without undertaking an independent determination of Lewis's credibility, this Court concludes that the Michigan Court of Appeals' decision that sufficient evidence was presented to identify Petitioner as one of the perpetrators did not "result[] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### 2. Assault with intent to rob while armed

Next, Petitioner argues that there was insufficient evidence to convict him of assault with intent to rob while armed or aiding and abetting assault with intent to rob while armed. Under Michigan law, the essential elements of assault with intent to rob while armed are: "'(1) an assault with force and violence; (2) an intent to rob or steal;

and (3) the defendant's being armed.'" *People v. Akins*, 259 Mich. App. 545, 554, 675 N.W.2d 863, 873 (2003) (quoting *People v. Cotton*, 191 Mich. App. 377, 391, 478 N.W.2d 681, 688 (1991)).  To be convicted of the crime as an aider and abettor, the prosecution must prove: "(1) that assault with intent to rob while armed was committed by the defendant or another person; (2) that the defendant performed acts or gave encouragement that assisted in the commission of assault with intent to rob while armed; and (3) that the defendant intended the commission of assault with intent to rob while armed or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *Sanford*, 2012 WL 975030, at *8.

The Michigan Court of Appeals held that sufficient evidence was presented to sustain the conviction.  Under Michigan law, "[a]n assault is defined as either an attempted battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Id.*  The state court relied on testimony that one or more individuals kicked in Locke's door and called for everyone to get down. Locke testified that she was terrified and the 911 call substantiated her testimony in this regard.  The state court found that "apprehension of an immediate battery" was a reasonable response to the forceful breaking in of Locke's door and the command for everyone to get down.  *Id.*  The assault was also found to have been committed with force and violence because of the kicking in of the door.  *Id.*  With regard to the

16

second prong, the Michigan Court of Appeals held that Lewis's testimony that Petitioner said they were going to "hit a lick," which Lewis understood to mean rob someone, demonstrated that Petitioner had the intent to rob or steal from Locke, and the discovery of Locke's abandoned purse in a baseball field, satisfied the intent element.  Further, Lewis's testimony that he saw Petitioner with a gun just before he walked toward the house and Petitioner's arrest while trying to recover the guns from a hiding place near Locke's house were sufficient to prove Petitioner was armed.  The Michigan Court of Appeals also held that the evidence was sufficient for a finding of guilt on this charge under an aiding and abetting theory because there was ample evidence that each participant, Petitioner, Sanford and Lester, assisted one another and either intended the commission of the crime or had knowledge that the principal intended its commission.  *Id.* at *9.

"[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  *McDaniel v. Brown*, 558 U.S. 120, 133, 130 S. Ct. 665, 673 (2010) (quoting *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793).  The decision of the Michigan Court of Appeals easily passes scrutiny under the deferential AEDPA standard, as the appellate court applied the correct constitutional test, relied on facts

17

amply supported in the record, and did not unreasonably apply clearly established constitutional law.

### 3. First-degree home invasion

Next, Petitioner argues that the evidence was insufficient to convict him of first-degree home invasion. As set forth in the Michigan Court of Appeals opinion, the elements of first-degree home invasion are: "(1) the defendant either breaks and enters a dwelling or enters a dwelling without permission, (2) the defendant either intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault, and (3) the defendant is armed with a dangerous weapon or another person is lawfully present in the dwelling while the defendant is entering, present in, or exiting the dwelling." *Sanford*, 2012 WL 975030, at \*10. To be convicted of first-degree home invasion as an aider and abettor, the prosecution must prove: "(1) that first-degree home invasion was committed by the defendant or another person; (2) that defendant performed acts or gave encouragement that assisted in the commission of first-degree home invasion; and (3) that defendant intended the commission of first-degree home invasion or had knowledge that the principal intended its commission at the time he gave aid and encouragement." *Id.*

Viewing the evidence in the light most favorable to the prosecution, the

Michigan Court of Appeals held that sufficient evidence was presented to satisfy each of the elements of first-degree home invasion beyond a reasonable doubt. The Michigan Court of Appeals relied on the following facts in reaching this conclusion: there was evidence that two doors to Locke's home were kicked in, Locke's and Brown's purses were taken from the home, Lewis testified that Leonard was carrying a handgun just before they walked toward Locke's house, and Locke was present in the house when the door was kicked in and the perpetrators entered the home. *Id.* at *10-11.

Petitioner challenges the state court's holding by arguing that Lewis's testimony was not credible. However, credibility determinations are reserved for the trier of fact. *See Moreland v. Bradshaw*, 699 F.3d 908, 918 (6th Cir. 2012) ("'[T]he assessment of the credibility of witnesses is generally beyond the scope of [habeas] review.'") (quoting *Brooks v. Tennessee*, 626 F.3d 878, 899 (6th Cir. 2010) (Daughtrey, J. concurring)). Crediting Lewis's testimony, as this Court must under the *Jackson* standard, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

### 4. Conspiracy to Commit Armed Robbery and First-Degree Home Invasion

Petitioner also challenges the sufficiency of the evidence regarding the conspiracy conviction, again arguing that Lewis's testimony should not be believed.

Michigan law defines a conspiracy as "a partnership in criminal purposes." *People v. Blume*, 443 Mich. 476, 481, 505 N.W.2d 843, 846 (1993) (internal quotations and citation omitted). To create a conspiracy, "two or more individuals must have voluntarily agreed to effectuate the commission of a criminal offense." *People v. Justice*, 454 Mich. 334, 345, 562 N.W.2d 652, 657-58 (1997). "The crime is complete upon formation of the agreement." *Id.* at 345-46, 562 N.W.2d at 658 (internal quotations and citation omitted).

The Michigan Court of Appeals held that sufficient evidence was presented to prove that Petitioner intended to combine with others to commit armed robbery and first-degree home invasion. The state court relied on Lewis's testimony regarding Petitioner's pre-robbery behavior and Locke's and Brown's testimony regarding what occurred when the men entered the home. Petitioner's challenge to Lewis's credibility is, as discussed, not an appropriate challenge on habeas review. According the state court's findings of fact a presumption of correctness, this Court concludes that the Michigan Court of Appeals' decision that sufficient evidence was presented to prove the conspiracy conviction did not "result[] in a decision that . . . involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

20

### 5.  Great Weight of the Evidence

Finally, Petitioner argues that the verdict was against the great weight of the evidence.  This claim is meritless.  In Michigan, a trial court may order a new trial "in the exceptional case in which the evidence weighs heavily against the conviction, or preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."  *People v. Lemmon*, 456 Mich. 625, 641, 576 N.W.2d 129, 136-37 (1998) (internal quotation marks and citations omitted).  The grant of a new trial under these circumstances is distinct from the due process issues raised by insufficient evidence, and "does not implicate issues of a constitutional magnitude." *Id.* at 634 n.8, 576 N.W.2d at 133 n.8.  Thus, a claim that a verdict is against the great weight of the evidence alleges an error of state law, which is not cognizable on habeas review.  *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990) (holding that "federal habeas corpus relief does not lie for errors of state law").

### B.  Jury Instruction Claim

Petitioner's second claim for habeas corpus relief concerns a jury instruction. He argues that the trial court violated his right to due process by refusing his request to instruct the jury on the offense of being an accessory after the fact.

"Generally speaking, a state court's interpretation of the propriety of a jury instruction under state law does not entitle a habeas claimant to relief."  *Rashad v.*

21

*Lafler*, 675 F.3d 564, 569 (6th Cir. 2012).  Federal habeas relief lies for a jury instruction claim only when the "instruction is so flawed as a matter of state law as to 'infect[] the entire trial' in such a way that the conviction violates due process." *Id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1737 (1977)).

The Michigan Court of Appeals reviewed the propriety of the requested accessory after the fact instruction and held that, under Michigan law, the trial court was correct in its decision not to instruct the jury on accessory after the fact. *Sanford*, 2012 WL 975030, at *23.  It is outside the province of a federal court, on habeas review, to second-guess a state court's interpretation of state law.  *See Davis v. Morgan*, 89 F. App'x 932, 936 (6th Cir. 2003).  Where a state appellate court has assessed the necessity and adequacy of a particular jury instruction under state law, a federal habeas court cannot question that state-law finding.  *Id.* at 936-37. Therefore, Petitioner's jury-instruction claim fails to state a claim upon which habeas relief may be granted.

## C.  Trial Court's Denial of Motion to Quash

Petitioner next contends that the trial court erred in denying his motion to quash the bindover because insufficient evidence supported a bindover.  This claim does not present a cognizable basis for habeas relief.  There is no general constitutional right to a preliminary examination before trial.  *See Gerstein v. Pugh*, 420 U.S. 103, 125

n.26, 95 S. Ct. 854, 869 n.26 (1975). A state court's failure to even hold a preliminary examination does not present a cognizable habeas claim. *See Scott v. Bock*, 241 F. Supp. 2d 780, 793 (E.D. Mich. 2003). Therefore, a claim that the evidence offered at a preliminary examination was insufficient for a finding of probable cause is not cognizable on habeas review. *See David v. Lavinge*, 190 F. Supp. 2d 974, 978 (E.D. Mich. 2002). Further, it is an "established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein*, 420 U.S. at 119, 95 S. Ct. at 865. Thus, "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Id.* at 119, 95 S. Ct. at 866. Because Petitioner is now incarcerated pursuant to a valid conviction, he cannot challenge the preliminary procedures employed prior to his trial. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### D. Scoring of Offense Variables

In his fourth habeas claim, Petitioner raises several sentencing-related claims. He argues that offense variables 1, 2, 10 and 13 were incorrectly scored, that the trial court improperly relied on facts not admitted by Petitioner or found by a jury in sentencing Petitioner, and that the presentence information report contained a prejudicial reference to an unrelated shooting.

"'[F]ederal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S. Ct. 475, 480 (1991) (quoting *Lewis*, 497 U.S. at 780, 110 S. Ct. at 3102). Petitioner's argument that the state court erred in scoring his sentencing guidelines is based solely on the state court's interpretation of state law. It does not implicate any federal rights. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 604 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review."); *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886 (1975) ("[S]tate courts are the ultimate expositors of state law."). "[A] claim that the trial court mis-scored offense variables in determining the state sentencing guidelines is not cognizable on habeas corpus review." *Adams v. Burt*, 471 F. Supp. 2d 835, 844 (E.D. Mich. 2007). Therefore, habeas corpus relief is not available for this claim.

Second, Petitioner argues that his sentence was improperly based upon facts not admitted by him or determined by the jury. In *Blakely v. Washington*, 543 U.S. 296, 125 S. Ct. 738 (2004), the Supreme Court held that, other than the fact of a defendant's prior conviction, any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely* involved a trial court's departure from Washington State's determinate sentencing structure. In contrast,

24

Michigan has an indeterminate sentencing system for most crimes, including that for which Petitioner is imprisoned. The maximum term of imprisonment is set by law. *People v. Drohan*, 475 Mich. 140, 160-61, 715 N.W.2d 778 (2006). Indeterminate sentencing schemes do not violate the Sixth Amendment by invading the province of the jury, so long as the defendant is sentenced within the statutory maximum. *Blakely*, 542 U.S. at 304-05, 308-09, 124 S. Ct. at 2537-38, 2540-41.

In this case, the sentencing court did not exceed the statutory maximum. Therefore, the sentencing scheme did not run afoul of the Sixth Amendment. Because *Blakely* and *Apprendi* do not apply to indeterminate sentencing schemes like the one utilized in Michigan, the trial court's sentence did not violate Petitioner's constitutional rights. *Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010); *see also Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009).

Finally, Petitioner argues that the presentence information report (PSIR) relied upon during sentencing improperly referenced Locke's statement that she had witnessed a triple shooting that occurred at Cheetah's, even though the shooting was unrelated to the home invasion. Petitioner raised this issue at sentencing and the trial court indicated that it would order the PSIR amended to indicate that Petitioner was not charged in that matter. On appeal, the Michigan Court of Appeals noted that while the PSIR had been amended to include a notation that Petitioner had not been charged

in that case, the trial court also agreed to amend the PSIR to indicate that there was no testimony relating the shooting to this case. Because the trial court did not do so, the Michigan Court of Appeals remanded the case to the trial court to amend the PSIR so that it was consistent with the trial court's ruling. *Sanford*, 2012 WL 975030, at *18-19. Petitioner does not argue that the trial court failed to comply with the order of remand. Therefore, the final portion of Petitioner's sentencing claim already has been resolved by the Michigan Court of Appeals.

### E. Admission of 911 Audiotape

Petitioner next seeks habeas relief because he argues that the trial court's admission of the 911 audiotapes into evidence violated the Michigan Rules of Evidence and his state and federal due process rights. He argues that the probative value of the calls was outweighed by the danger of unfair prejudice.

"'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) (quoting *Estelle*, 502 U.S. at 67-68, 112 S. Ct. at 480). "The standard of review is therefore very deferential on such claims." *Hudson v. Lafler*, 421 F. App'x 619, 627 (6th Cir. 2011). An evidentiary ruling may violate due process only where it "is so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Whether an error in the admission of evidence

26

"constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical[,] highly significant factor." *Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).

The Michigan Court of Appeals determined that the 911 calls were properly admitted under Michigan law. *Sanford*, 2012 WL 975030, at *22. First, the Court of Appeals noted that the 911 calls were relevant because they corroborated the witnesses testimony, making it more probable that the incident occurred in the manner described by the witnesses. *Id.* Second, the Court of Appeals considered that the 911 calls would not *unfairly* prejudice Petitioner because they would not have a tendency to make the jury decide the case on an improper basis. *Id.* Based upon these factors, the Michigan Court of Appeals held that the tapes were properly admitted.

Petitioner fails to show that the purported evidentiary error rose to the level of a federal constitutional claim warranting relief. "[U]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Lawson*, 535 F.3d 434, 442 (6th Cir. 2008) (internal quotation marks and citation omitted). The 911 tape was probative of the circumstances of the crimes and did not suggest a decision on an improper basis. Therefore, the state court's admission of this evidence was reasonable and did not result in a denial of

fundamental fairness.

## VI.  CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04 (2000) (citation omitted).  In this case, the Court concludes that reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the Court will deny a certificate of appealability.  However, Petitioner is granted leave to proceed in forma pauperis on appeal.

## VII.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of

habeas corpus and a certificate of appealability are **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.  Petitioner is **GRANTED** leave to proceed in forma pauperis on appeal.

      **SO ORDERED**.

                                     s/PATRICK J. DUGGAN
                                     UNITED STATES DISTRICT JUDGE

DATE:August 7, 2015

Copies to:
Donte Leonard
Elizabeth M. Rivard, Esq.
Laura Moody, Esq.